**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AVENUE STORES, LLC, *et al.*,[1] | Case No. 19-11842 (____) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF DAVID RHOADS IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

Pursuant to 28 U.S.C. § 1746, I, David Rhoads, do hereby declare, under penalty of perjury, the following to the best of my knowledge and belief:

1. I am the President and Chief Financial Officer for Avenue Stores, LLC ("Avenue"), a Delaware limited liability company. I also serve as the President and Chief Financial Officer for Avenue's affiliates, (i) Ornatus URG Holdings, LLC ("Ornatus Holdings"), a Delaware limited liability company; (ii) Ornatus URG Real Estate, LLC ("Ornatus RE"), a Delaware limited liability company; and (iii) Ornatus URG Gift Cards, LLC ("Ornatus GC," and collectively with Avenue, Ornatus Holdings, and Ornatus RE, the "Debtors"), a Virginia limited liability company. A copy of the organizational chart that includes all four Debtors and their non-debtor parent is attached hereto as Exhibit A (the "Corporate Organization Chart").

2. I have over twenty years of experience in corporate finance and accounting, having served in numerous senior level positions with several retail companies, including VILLA, Moda Operandi, Inc., and Ann Inc., among others. I received a Master's of Business Administration from New York University and a Bachelor's Degree from La Salle University.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Avenue Stores, LLC (0838); Ornatus URG Holdings, LLC (1146); Ornatus URG Real Estate, LLC (9565); and Ornatus URG Gift Cards, LLC (9203). The Debtors' headquarters are located at 365 West Passaic Street, Suite 230, Rochelle Park, New Jersey 07662.

3.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing these chapter 11 cases (collectively, the "Chapter 11 Cases"). The Debtors intend to operate their business and manage their properties as debtors in possession during the pendency of these Chapter 11 Cases.

4.     This declaration (this "Declaration") is submitted (i) to provide an overview of the Debtors and these Chapter 11 Cases and (ii) in support of the Debtors' chapter 11 petitions and "first day" motions (each a "First Day Motion," and collectively, the "First Day Motions"), which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize value for the benefit of their estates and creditors.

5.     If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge. In my capacity with the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, financial condition and books and records. My testimony herein is based on my service as an officer of the Debtors, my review of the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me by other employees of the Debtors and the Debtors' professional advisors.

6.     Prior to the commencement of these Chapter 11 Cases I, among other things, (i) reviewed and discussed the Debtors' strategy regarding the development of potential restructuring and sale alternatives and, ultimately, implementation of the value-maximizing transactions described herein; (ii) supervised the preparation of the documentation needed to

01:24702593.10

implement the restructuring initiatives contemplated during these Chapter 11 Cases; and (iii) consulted on a regular basis with the Debtors' other senior management members and outside advisors with respect to the foregoing.

7.       Section I of this Declaration describes the Debtors' business history, corporate structure, governance model, and prepetition indebtedness.  Section II describes the events and circumstances that triggered the commencement of these Chapter 11 Cases. Section III discusses the Debtors' efforts to obtain postpetition financing and the agreement reached in connection therewith.  Section IV details the Debtors' objectives for these Chapter 11 Cases and the contemplated means by which such objectives will be met.  Finally, Section V sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

## I.      Business History, Corporate Structure, and Prepetition Indebtedness

*A.      Company History and Corporate Structure*

8.       Avenue has been a leader in the fashion industry for plus-size clothing for over thirty years.  The "Avenue" brand was founded in 1987 when national retailer Limited Brands, Inc. combined its "Lerner Woman" store group with its "Sizes Unlimited" store group and was subsequently spun off as an independent division and renamed United Retail Group, Inc. ("United Retail Group") in 1989.  United Retail Group conducted an initial public offering in 1992 and operated as a public company that traded on NASDAQ under the symbol "URGI" until November 2007, when it was acquired by VLP Corporation, an affiliate of Redcats USA, Inc. ("Redcats USA").

9.       After United Retail Group's acquisition by Redcats USA, the company experienced operating losses driven by sales declines in retail stores, which led United Retail

Group and certain of its affiliates (collectively, the "Prior Debtors") to commence bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") on February 1, 2012, which were jointly administered through the lead case, *In re United Retail Group, Inc., et al.*, Case No. 12-10405 (SMB) (the "Prior Chapter 11 Cases"). The Prior Chapter 11 Cases were commenced to pursue a going-concern sale of the Prior Debtors' assets, with Avenue (formerly known as Ornatus URG Acquisition, LLC) serving as the stalking horse bidder. On April 4, 2012, the New York Bankruptcy Court approved the sale of substantially all of the Prior Debtors' assets to Avenue (the "Prior Sale"), which closed on April 13, 2012.

10.     The Debtors adopted their current corporate and operational structure in connection with the Prior Sale and consummation thereof. As reflected in the Corporate Organization Chart, Ornatus Holdings is a holding company that owns 100% of the membership interests in: (i) Avenue, which is the entity through which the Debtors conduct their business operations; (ii) Ornatus RE, which holds certain fixed assets that were previously located at the Debtors' Ohio Distribution Center (defined below); and (iii) Ornatus GC, which has historically processed and issued gift cards and merchandise credits.

11.     Investment funds advised by Versa Capital Management, LLC (the "Sponsor") hold indirectly approximately 99% of the Class A Units issued by Ornatus Holdings, with the remaining Class A Units held by a third-party investor. In addition to Class A Units, those same equity holders hold 100% of the Class A-1 Units and Class B Units issued by Ornatus Holdings.

B.     *Current Business Operations*

12.     Avenue is a national specialty fashion retailer of women's plus-sized apparel, intimates, footwear, and accessories that is dedicated to providing real-sized women with

4

modern and fashionable clothes at affordable prices.  Avenue's product line almost exclusively features a marketplace sourced and procured assortment of branded merchandise, including: (i) "Avenue" brand apparel, undergarments, loungewear, intimates, accessories, and gifts; (ii) a line of trendy, fashion-forward apparel, intimates, and swimwear for plus-sized women sold under the "Loralette" brand; and (iii) wide-width shoes sold under the "Cloudwalkers" brand.  In addition, Avenue sells a select assortment of national brands within their shoe and accessory departments.

13.     Headquartered in Rochelle Park, New Jersey (the "<u>New Jersey Headquarters</u>"), the Debtors have two primary units: the retail store business and an e-commerce business.  Through their retail business, the Debtors operate 255 leased stores in 35 states, which are primarily located in suburban areas and in malls or shopping centers.[2]  In addition to their retail operations, the Debtors sell and distribute merchandise through the Avenue.com and Loralette.com websites (the "<u>E-Commerce Business</u>").  For the period from January through May of 2019, the Debtors generated approximately $75.3 million in sales and had negative EBITDA of approximately $886,000.  Retail store sales accounted for approximately 64% of the Debtors' total annual sales, while the Debtors' E-Commerce Business generated approximately 36% in sales.

14.     As of the Petition Date, the Debtors employed, in the aggregate, approximately 2,000 employees.  Approximately 790 employees work on a full-time basis, while the remainder work on a part-time basis.  There are approximately 64 employees at the New Jersey Headquarters and approximately 1,918 store-level employees.  This reflects the reduction in force conducted by the Debtors prior to the commencement of the Chapter 11 Cases.  The

---

[2]     As of the Petition Date, the Debtors were in the process of winding down operations at thirty-two of their 255 stores and conducting clearance sales in furtherance thereof.  The Debtors intend to complete store closing sales and vacate these thirty-two stores before the end of August 2019.

Debtors' employees are not covered by a collective bargaining agreement.

15.      The Debtors order their merchandise from both domestic and foreign vendors through a worldwide logistics network of common carriers, freight forwarders, customs agents, drayage providers, rail carriers, and truckers.  Prior to initiating the restructuring efforts described herein, the Debtors maintained a centralized distribution system in which all store-bound merchandise was received, sorted, and repacked at their distribution center located in Troy, Ohio (the "Ohio Distribution Center"), with most e-commerce merchandise shipped directly to the Debtors' third-party warehousing facility in Dallas, Texas, operated by a third-party logistics provider (the "Texas Distribution Center").[3]  Merchandise was then either distributed from the Ohio Distribution Center to the Debtors' retail stores or sent to the Texas Distribution Center where it is held until shipped to online shoppers.[4]  Shortly before the Petition Date, however, the Debtors closed the Ohio Distribution Center and, to the extent applicable, transitioned any remaining inventory to the Texas Distribution Center or to their retail locations.

C.      *Prepetition Indebtedness*

16.      The Debtors' prepetition debt structure primarily consists of (i) the Pre-Petition ABL Facility; (ii) the Pre-Petition Subordinated Note; and (iii) other unsecured debt consisting of, among other things, employee-related liabilities and trade debt, including amounts owed to landlords in connection with certain leases of nonresidential real property.

I.      *Pre-Petition ABL Facility*

17.      On April 12, 2019, Avenue, Ornatus Holdings, and Ornatus GC entered

---

[3]      The Debtors owned the Ohio Distribution Center until December 21, 2018, when they entered into a sale-leaseback transaction with Rosdev Development, Inc. (the "Sale-Leaseback Transaction").  In connection with the Sale-Leaseback Transaction, the Debtors sold the Ohio Distribution Center for net proceeds of $11.3 million and entered into a 15 year lease with RD Dayton, LLC.

[4]      The Texas Distribution Center has been historically used to exclusively store and distribute inventory purchased online.

into that certain Revolving Credit and Security Agreement (as amended, restated, modified, supplemented or replaced from time to time, the "Pre-Petition ABL Credit Agreement")[5] with PNC Bank, National Association ("PNC"), as lender and agent (in such capacities, the "Pre-Petition ABL Agent" and the underlying facility, the "Pre-Petition ABL Facility").  The Pre-Petition ABL Facility permits borrowings of up to $45 million, including a first-in, last-out loan tranche (the "FILO Loan") of $6 million, which can increase by an additional $4 million during the period commencing on December 1 of each year and ending on the last day of February of the following year.  The Pre-Petition ABL Facility is guaranteed by Ornatus RE and secured by a first-priority lien on all of the Debtors' assets other than the Excluded Property (the "Collateral"). Amounts due under the FILO Loan are also guaranteed by affiliates of the equity holders.

18.     Availability under the Pre-Petition ABL Facility is capped by a borrowing base, which is calculated monthly based on percentages of the value of certain of the Debtors' inventory, and receivables, and is subject to certain reserves and sub-limits.  The Pre-Petition ABL Facility matures on April 12, 2024.  As of the date hereof, the aggregate amount of all obligations outstanding under the Pre-Petition ABL Facility was no less than $15,262,763.08.

19.     On July 22, 2019, the Pre-Petition ABL Agent issued that certain Notice of Events of Default and Imposition of Default Rate of Interest (the "Notice of Default") indicating that the Debtors were in default under the Pre-Petition ABL Credit Agreement.  At the same time, the Pre-Petition ABL Agent implemented a cash dominion structure whereby all cash held in the Debtors' store deposit and collections accounts with PNC are swept on a daily basis to pay down the Pre-Petition ABL Facility.  Under this structure, the Debtors are required to re-borrow cash under the Pre-Petition ABL Facility on an as-needed basis to make disbursements.  Finally, the

---

[5]   Capitalized terms used in describing the Pre-Petition ABL Facility but not otherwise defined herein shall have the meanings ascribed to such terms in the Pre-Petition ABL Credit Agreement.

01:24702593.10

Pre-Petition ABL Agent has applied the default rate of interest to the outstanding obligations under the Pre-Petition ABL Facility as a result of the Notice of Default.

## II. *Pre-Petition Subordinated Note*

20.     On or about April 12, 2019, Ornatus Holdings issued that certain Master Subordinated Note (as amended, restated, modified, supplemented or replaced from time to time, the "Pre-Petition Subordinated Note") in favor of Ornatus URG Funding, LLC (the "Pre-Petition Subordinated Lender"), an affiliate of the Debtors' equity holders, which secures a loan in the principal amount of approximately $38,394,840 plus additional amounts advanced by the Pre-Petition Subordinated Lender, the Sponsor, or any of such parties' affiliates from time to time (the "Pre-Petition Subordinated Note").  The Pre-Petition Subordinated Note is guaranteed by Avenue, Ornatus GC, and Ornatus RE and is collateralized by a security interest in the Collateral, which, under the terms of the Pre-Petition Subordinated Note, is subordinate to the obligations under the Pre-Petition ABL Facility.  The Pre-Petition Subordinated Note bears interest at a rate of 15% per annum, which is paid in kind.

21.     The Pre-Petition Subordinated Note replaced that certain Master Subordinated Note dated as of December 13, 2017, among Ornatus Holdings and the Pre-Petition Subordinated Lender totaling approximately $34,044,840, inclusive of letters of credit totaling $11 million, provided a new cash advance of $3,700,000, and capitalized certain outstanding fees and expenses owed by the Debtors.  As contemplated by that certain Liquidity Support Agreement by and among the Debtors and the Pre-Petition Subordinated Lender, dated April 12, 2019 (the "Liquidity Support Agreement"), the terms of the Pre-Petition Subordinated Note allow the Sponsor, through the Pre-Petition Subordinated Lender, to cause additional funds to be advanced from time to time to support the Debtors' business operations.  From October of 2018

through April of 2019, the Sponsor or the Pre-Petition Subordinated Lender provided capital infusions to the Debtors of approximately $25.2 million, consisting of approximately $14.2 million funded directly to the Debtors and $11 million in letters of credit provided for the Debtors' benefit, and deferred or funded certain expenses on behalf of the Debtors in the aggregate amount of approximately $2.1 million. As of the Petition Date, no less than $37,757,298 was due under the Pre-Petition Subordinated Note.

### III. *Other Unsecured Debt*

22.     As of the Petition Date, the Debtors' books and records reflected accounts payable due and owing in an amount exceeding approximately $25 million on account of unsecured debt, including amounts owed to the Debtors' landlords for past-due rent.

## II.    Circumstances Leading to the Commencement of These Chapter 11 Cases and Prepetition Restructuring Efforts

23.     The Debtors operate in an extremely competitive retail environment, facing competition from other specialty-retail stores, including Lane Bryant, Ashley Stewart, and Torrid, and mass-market retailers such as Walmart and Target, many of which are located in close proximity to Avenue stores. In addition to long-standing, traditional competitors within the plus-size segment, there has been a recent influx of many other iconic fashion retail brands expanding their range of size offerings into the plus-size range, as well as a proliferation of new entrants targeting this same plus-size fashion market. Due to increased competition, the Debtors have faced significant pressure to maintain market share, which has directly and negatively affected their profitability.

24.     At the same time, the retail industry, in general, has struggled as consumers have shifted away from brick-and-mortar stores to online retail channels in recent years. Retail companies that have a significant brick-and-mortar presence, like Avenue, bear higher expenses

than web-based retailers and are heavily dependent on store traffic, which has decreased significantly as consumers increasingly shop online.  Other macro-economic factors have further compounded the problems plaguing retailers.  For instance, changes in consumer spending habits have necessitated many retailers to increase promotional activities and discounting, leading to thinner profit margins.  Onerous brick-and-mortar lease terms and increased operating costs, during a period of downturn in the retail sector and deep discounting, have intensified retail losses.  Indeed, these macro-economic challenges have compelled numerous national retailers to file chapter 11 cases over the past year, including Charming Charlie, FULLBEAUTY, Charlotte Russe, Shopko, Gymboree, Things Remembered, Payless ShoeSource, and Diesel USA, among others.

25.    The initiatives implemented by the Debtors subsequent to the Prior Chapter 11 Cases were initially successful and resulted in the Debtors operating profitably for more than five years.  However, the Debtors have struggled to overcome various financial and operational challenges in this difficult retail environment, including those that existed before the Debtors acquired the "Avenue" business operations in 2012.  Following the Prior Chapter 11 Cases, the Debtors addressed many operational efficiencies and implemented brand enhancement efforts, resulting in improvements to merchandising and pricing strategies, a reduced brick-and-mortar footprint, and the growth of the Debtors' E-commerce Business.  Most recently, for example, the Debtors have, among other things: (i) implemented new customer relationship management software and worked with their advisors to identify options for a new enterprise resource planning system; (ii) strategized ways to leverage their e-commerce platform through Amazon.com and other websites; (iii) explored the expansion of their relationship with the Army & Air Force Exchange Service; and (iv) worked to improve their buy online/pickup in store process.

10

26.    Unfortunately, the Debtors, like many other retailers, have not been able to overcome the retail challenges discussed above and have recently suffered operational losses stemming from, among other things, onerous lease obligations, underperforming retail locations, and the continued growth of online competitors and decline of in-store shoppers.  In addition, although Avenue benefits from a consistent and loyal customer base, a review of historic customer data indicates that Avenue customers are shopping less frequently than they once were, and sales during Avenue's busiest periods of the year—leading up to Easter and Mother's Day— did not meet projected forecasts, leading to a reduction in liquidity.  Shifts in consumer preferences in the women's apparel retail segment and, in the plus-size market specifically, have contributed to sales misses as well, with the Debtors ultimately placing too much emphasis on fashion basics.

27.    In this context, the Debtors and their advisors began exploring restructuring alternatives and, in furtherance thereof, engaged the services of an independent director, Matthew Kahn, who has significant experience providing fiduciary services for distressed retailers of the Debtors' size and scope.  Mr. Kahn has previously served on the boards of more than twenty companies, both public and private, including Things Remembered, Z Gallerie, Bargain Shop, Deb Shops, Party City, Spencer Gifts, McNaughton Apparel, and Weathervane, among others.  In addition, Mr. Kahn has more than twenty-five years of experience in private equity, structured lending, and credit investing.

28.    To explore all viable restructuring alternatives and help structure the Debtors' go-forward strategy, Debtors also retained Berkeley Research Group, LLC ("BRG") as turnaround advisors and appointed Robert J. Duffy as Chief Restructuring Officer on the Petition Date, and retained Young Conaway Stargatt & Taylor, LLP ("YCST") as restructuring counsel.

29.     Prior to the Petition Date, Avenue's Board of Directors (the "Board")
established an independent restructuring committee (the "Restructuring Committee") to review,
evaluate, and make recommendations to the Board with respect to (a) the proposed terms of
engagement for an investment banker that would be retained to solicit interest in the Debtors'
Going Concern Assets (as defined below) and (b) any bids submitted by the Sponsor or its
affiliates for the Going Concern Assets, as applicable.  The Board appointed Mr. Kahn as the sole
member of the Restructuring Committee.

30.     Mr. Kahn and the other Board members, with the advice of BRG and
YCST, considered numerous potential ways to address the Debtors' debt structure and liquidity
issues, and ultimately determined that it was appropriate to wind down the Debtors' brick-and-
mortar operations prior to, and during, these Chapter 11 Cases.  Accordingly, during July 2019,
the Debtors (i) commenced store closing sales at thirty-two of their underperforming retail
locations (collectively, the "Initial Closing Stores," and such sales, the "Initial Store Closing
Sales") and (ii) took steps to retain an agent to oversee and implement store closing sales at the
Debtors' remaining locations.[6]  In addition, as noted above, the Debtors closed the Ohio
Distribution Center and unequivocally surrendered the facility to the applicable landlord on July
31, 2019.

31.     The Board further determined to focus on sustaining the Debtors' E-
Commerce Business as an independent going concern to maximize the value of the Debtors'
estates given the relative strength of the E-Commerce Business compared to the Debtors' brick-
and-mortar operations and transformations in the retail industry discussed above.  Once it became
clear that the Debtors would focus on the E-Commerce Business and wind down their brick-and-
mortar operations on a chain-wide level and with Court oversight, the Debtors retained Malfitano

---

[6]     The Initial Closing Stores are each subject to leases that are expiring in the near term.

Advisors, LLC ("Malfitano") to serve as asset disposition advisor and consultant to solicit both "equity" and "fee" based liquidation proposals from various national liquidation firms that could handle the disposition of a significant portion of the Debtors' assets.

32.     In an effort to streamline and expedite the liquidation process, the Debtors created an online data room and contacted multiple nationally recognized liquidation firms or joint ventures thereof.  After evaluating various bids, including proposals that also contemplated liquidating inventory stored in the Texas Distribution Center through the Debtors' online platform, the Debtors and their advisors determined to hold an auction to select a liquidation agent to sell store level inventory at all of the Debtors' retail locations other than the Initial Closing Stores (the "Remaining Closing Stores") and inventory related to the E-Commerce Business, subject to the E-Commerce Option (defined below).  In connection therewith, the Debtors negotiated a "stalking horse" agency agreement with the Stalking Horse (the "Stalking Horse Agreement").

33.     On August 9, 2019, the Debtors conducted an auction between the competing liquidators based upon the form of and terms in the Stalking Horse Agreement.  The auction was attended by counsel to the Debtors, Malfitano, and counsel to the Pre-Petition ABL Lenders (as well as the bidders) and was duly transcribed.  The Debtors determined (in consultation with the Pre-Petition ABL Lenders) that the bid submitted by the Agent represented the highest and best offer, and that entry into the Agency Agreement with the Agent to conduct store closing sales or similar themed sales at the Remaining Closing Stores and, subject to the exercise of the E-Commerce Option, of the E-Commerce Business inventory (the "Store Closing Sales") was in the best interests of the Debtors and their estates.  The Agency Agreement provided additional consideration in excess of $500,000 than that contemplated by the Stalking

01:24702593.10

Horse Agreement and provided an additional two weeks for the E-Commerce Option to be exercised, which may provide the Debtors with significant benefit as it moves through the Going Concern Sale Process.  The Debtors and the Agent entered into that certain Agency Agreement (the "Agency Agreement") immediately following the auction conducted on August 9, 2019.

34.    The Initial Store Closing Sales commenced prior to the Debtors' retention of the Agent and are being conducted without the Agent's assistance.  The Debtors intend to vacate the Initial Closing Stores upon conclusion of the Initial Store Closing Sales, expected to be no later than August 31, 2019.  The Agent commenced the Store Closing Sales at the Remaining Closing Stores on August 10, 2019, and sales at both the Initial Closing Stores and Remaining Closing Stores remain in progress as of the date hereof.  The Debtors intend to vacate the Remaining Closing Stores upon the conclusion of the Store Closing Sales, anticipated to be no later than the end of September 2019.

35.    At the same time that the Debtors determined to liquidate their store-level inventory, engage the Agent, and close the Ohio Distribution Center, the Debtors and the Sponsor, on the Debtors' behalf, began soliciting interest from third parties that the Debtors, in consultation with their advisors, determined may have a viable interest in purchasing the Debtors' remaining assets, or a subset thereof.  With the input of the Restructuring Committee and upon obtaining full Board approval, the Debtors retained Configure Partners, LLC ("Configure") to serve as the Debtors' investment banker.  As of the Petition Date, Configure has contacted more than 70 parties, has entered into approximately 20 confidentiality agreements (and is actively negotiating such agreements with a number of additional interested parties), established a data room to provide potential purchasers access to information regarding the Debtors' operations, and has disseminated a confidential information memorandum to those that have entered into

14

confidentiality agreements.

36.     After evaluating interest expressed by potential purchasers, the Debtors intend to commence a bidding and sale process (the "Going Concern Sale Process") for, among other things, their E-Commerce Business, inventory stored in the Texas Distribution Center, and their intellectual property (collectively, the "Going Concern Assets").  Despite the interest to date expressed in the Going Concern Assets, a stalking horse purchaser has not yet emerged. However, the Debtors, with the assistance of Configure, are continuing to engage with potential purchasers of the Going Concern Assets.

37.     At the outset of these proceedings, the Debtors will seek Court authority to establish an auction and sale timeline that will allow the Debtors to implement certain bidding procedures and maximize value for all interested parties in an efficient and effective manner, while meeting milestones agreed to with the DIP Agent.  Specifically, as reflected in the Agency Agreement, in the event that the Debtors either (a) do not secure a letter of intent for the purchase of the Going Concern Assets by September 14, 2019 or, in the event a letter of intent is obtained, (b) do not also secure a binding stalking horse bid for such assets by September 24, 2019, the E-Commerce Business inventory will be sold to the Agent on the terms set forth in the Agency Agreement (the "E-Commerce Option") and the Debtors will initiate a standalone sale process for their intellectual property.

38.     Given the surrounding circumstances and the commencement of these Chapter 11 Cases, the Debtors determined that it was appropriate to issue notices (the "WARN Notices") under the Worker Adjustment and Retraining Notification Act, and related state statutes, to employees at the New Jersey Headquarters as well as regional sales directors, district sales managers, and loss prevention managers.  Accordingly, on July 31, 2019, 152 employees

received WARN Notices advising such employees that, absent procuring a buyer for the Going Concern Assets and a corresponding decision by that buyer to offer continued employment to applicable individuals, affected employees would be terminated effective September 30, 2019. Due to increased liquidity constraints, prior to the commencement of these Chapter 11 Cases, the Debtors conducted a reduction in force of approximately 83 employees.

39.    After considering all viable restructuring options and taking the steps identified herein to address operational and liquidity challenges prior to the Petition Date, I believe that the Store Closing Sales and Going Concern Sale Process represent the best means through which to maximize value for the estates and all interested parties.

## III.    Debtor-in-Possession Financing

40.    To implement their planned sale process and preserve asset value during the pendency of these Chapter 11 Cases, the Debtors require continued access to liquidity.  Given the existing liens on substantially all of the Debtors' assets and the need for immediate liquidity, the Debtors' existing lenders were the most practical and reasonable source of financing. Accordingly, to finance these Chapter 11 Cases and provide sufficient liquidity to preserve the value of the Debtors' assets while the Store Closing Sales and Going Concern Sale Process are pending, the Debtors negotiated the terms of a DIP Facility (defined below) to be provided by PNC.  The Debtors believe that the DIP Facility will provide the Debtors with sufficient liquidity to conduct a fulsome and flexible sale process so that they may ultimately conduct a competitive auction for the Going Concern Assets under section 363 of the Bankruptcy Code, efficiently implement and conclude the Store Closing Sales, and maximize the value of the Debtors' estates for the benefit of all stakeholders.

41.    Specifically, PNC has committed to enter into a senior secured priming

16

debtor-in-possession credit facility (the "DIP Facility") that will consist of a $12 million revolving loan commitment that will be used to refinance all outstanding obligations under the Pre-Petition ABL Facility, upon entry of a final order, and provide the Debtors with sufficient funding to sustain their operations during these Chapter 11 Cases. Pending entry of a final order approving the DIP Facility, collections from the Debtors' operations, including the initial guaranteed payment in connection with the Store Closing Sales, all of which are subject to the existing liens of PNC under the prepetition revolving credit facility, will be applied to reduce the revolving credit advances made by PNC that were outstanding as of the Petition Date.

## IV.    Objectives for Chapter 11 and Proposed Sale Initiatives

42.    For the reasons outlined above, the Debtors believe that the commencement of these Chapter 11 Cases is a necessary and prudent measure to maximize the value of the Debtors' estates. At the outset of these proceedings, the Debtors seek authority to continue the Store Closing Sales, with the Agent's assistance, while concluding the Initial Store Closing Sales by the end of August 2019. At the same time, as noted above, the Debtors will also implement the Going Concern Sale Process and seek Court authority to conduct an auction and sale process that will conclude within approximately 60 days of the Petition Date. To that end, the Debtors will file a motion seeking authority to implement the Going Concern Sale Process to consummate a sale (the "Sale") that they expect will generate maximum value for the Going Concern Assets and preserve the highest number of jobs. In consultation with their professional advisors, the Debtors developed certain bidding procedures (the "Bidding Procedures"), which are designed to preserve flexibility in the Going Concern Sale Process, generate the greatest level of interest, and result in the highest or best value for the Going Concern Assets. Among other things, the Bidding Procedures create an appropriate timetable for the Sale, consistent with the milestones under the

17

DIP Facility.

43.     In addition, to avoid incurring any unnecessary administrative expenses with respect to the Ohio Distribution Center, which was vacated and unequivocally surrendered on July 31, 2019, the Debtors will seek to reject the related lease *nunc pro tunc* to the Petition Date.  The Debtors will also take a number of steps to reduce their expenses moving forward, including filing additional contract and lease rejection motions as the Store Closing Sales run their course, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors determine are unlikely to be assumed and assigned and will no longer be necessary to the Debtors' business operations or a go-forward buyer.

44.     Finally, as these Chapter 11 Cases, the Going Concern Sale Process, and Store Closing Sales each progress, the Debtors will continue to analyze their asset portfolio and available disposition alternatives with respect to all available assets in the interests of preserving and maximizing estate value.

## V.      First-Day Motions[7]

45.     As a result of my first-hand knowledge, and through my review of various materials and information, discussions with members of the Debtors' management and the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of the assets for the benefit of all stakeholders, (c) the deleterious effects upon the Debtors of not obtaining the relief sought in the First Day Motions, and (d) the immediate and irreparable harm to which the Debtors will be exposed upon the commencement of these Chapter 11 Cases unless the relief requested in the

---

[7]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions, as applicable.

01:24702593.10

First Day Motions is granted without further delay.

46.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met so as to allow the Store Closing Sales and Going Concern Sale Process to succeed, and that the Debtors suffer no immediate and irreparable harm during these Chapter 11 Cases.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewing pleadings related thereto.  At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases.

A.     *Claims Agent Retention Application*

47.     The Debtors request entry of an order, pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), authorizing the retention and appointment of Prime Clerk LLC ("Prime Clerk") as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Prime Clerk retention application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In addition, I have been advised by the Debtors' proposed counsel that Prime Clerk's retention is required by the Local Rules in light of the Debtors' anticipated number of creditors.  In light of the foregoing and Prime Clerk's competitive rates, the Debtors respectfully request that the application to retain Prime Clerk as claims and noticing agent be approved.

B.     *Utilities Motion*

48.     By this motion (the "Utility Motion"), and to ensure continued provision of

utility services (the "Utility Services") to each of the Debtors' retail locations and the New Jersey

Headquarters, the Debtors seek entry of interim and final orders (i) prohibiting the Debtors' utility

service providers (collectively, the "Utility Service Providers") from altering, refusing, or

discontinuing utility service on account of unpaid prepetition invoices, (ii) deeming the Utility

Service Providers to be adequately assured of future payment, and (iii) establishing procedures for

determining additional adequate assurance of future payment and authorizing the Debtors to

provide adequate assurance of future payment to the Utility Service Providers.  The Debtors

propose establishing a segregated account into which the Debtors will deposit a sum equal to

approximately 50% of the Debtors' estimated aggregate monthly utility expenses and,

additionally, have proposed procedures to address any request made by the Utility Service

Providers for additional adequate assurance.

49.    Any disruption of the Debtors' Utility Services would cause irreparable

harm to the Debtors' business operations, their estates and the success of the Store Closing Sales.

The successful consummation of the Store Closing Sales and the sales of any other assets (as

applicable) require that the Utility Services be provided on a continual and uninterrupted basis

while the Debtors remain in their retail locations and operating from the New Jersey

Headquarters.  Any disruption of the Utility Services could have a significant impact on the

Debtors' business operations and efforts to maximize value for the estates.  As the Store Closing

Sales conclude, the Debtors will take immediate action to minimize postpetition expenses,

including with respect to utility services that will no longer be necessary upon exiting the

Debtors' retail locations.

50.    For the foregoing reasons, the Debtors submit, and I believe, that the relief

requested in the Utility Motion is in the best interest of the Debtors, their estates and their

creditors, and should therefore be approved.

C.      *Cash Management Motion*

51.      By this motion (the "Cash Management Motion"), the Debtors seek entry of an order, among other things, (i) authorizing continued use of their existing (a) bank accounts, (b) cash management system, and (c) checks and business forms, and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code in connection therewith on an interim basis.  In addition, the Debtors also request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery.

52.      As described in detail in the Cash Management Motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System").  To lessen the disruption caused by the bankruptcy filing and maximize the value of their estates in these Chapter 11 Cases, it is vital that the Debtors maintain their Cash Management System and be authorized to, *inter alia*, pay any outstanding Bank service and other fees owed in relation to their Cash Management System.

53.      The Debtors maintain current and accurate accounting records of daily transactions and submit that maintaining this Cash Management System will prevent undue disruption to the Debtors' operations while protecting the Debtors' cash for the benefit of their estates.  It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their business operations. Absent obtaining the relief requested in the Cash Management System, the Debtors will not be able to maximize value through the Store Closing Sales and the Going Concern Sale Process.

01:24702593.10

54.    Accordingly, the Debtors request that the relief requested in the Cash Management Motion be approved.

D.    *Insurance Motion*

55.    By this motion (the "Insurance Motion"), the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change, the insurance programs (including by obtaining "tail" coverage) (collectively, the "Insurance Programs") summarized in the Insurance Motion, (b) pay, in their sole discretion, all undisputed policy premiums, claims, deductibles, retentions, administrative fees, broker fees and other obligations relating to the Insurance Programs (such obligations, the "Insurance Obligations") that were or are due and payable, and relate to the period before or after the Petition Date, and (c) continue their Financed Programs (as defined below) and renew or enter into new premium financing programs, and (ii) authorizing the Debtors' banks (collectively, the "Banks") to honor and process check and electronic transfer requests related thereto.

56.    In the ordinary course of business, the Debtors have maintained, and continue to maintain, a number of insurance policies for, among other things, (i) general liability, (ii) automobile, (iii) umbrella, (iv) excess liability, (v) cargo, (vi) property/all risk, (vii) directors & officers liability, employment practices liability, fiduciary liability, and commercial crime, and (viii) excess directors & liability, among others.  The Debtors employ Marsh USA (the "Broker") to assist them with the procurement and negotiation of their Insurance Programs.

57.    I believe that maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction, and necessary to preserve value during these Chapter 11 Cases.  Authority to pay any prepetition Insurance Obligations—to the extent that the Debtors determine that such payment is necessary to avoid

cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the Insurance Programs—is imperative, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets, and, in most cases, such coverage is required by the various contracts and laws that govern the Debtors' operations.  Furthermore, it is my understanding that, under the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage during these Chapter 11 Cases, and such coverage is provided by certain of the policies included in the Insurance Programs.

58.     Because it is not economically advantageous for the Debtors to pay the premiums on each of their Insurance Programs on an annual basis, from time to time and in the ordinary course of business, the premiums on certain of the Insurance Programs are financed (such programs, the "Financed Programs") pursuant to a premium finance agreement (the "PFA") between the Debtors and AFCO Premium Credit LLC ("AFCO").  If the Debtors are unable to continue making payments under the PFA, AFCO may be permitted to terminate the Financed Programs, at which point the Debtors would be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.  Given the importance of maintaining insurance coverage under the Financed Programs during these Chapter 11 Cases, and preserving the Debtors' limited liquidity by financing insurance premiums, I believe that it is in the best interest of the Debtors' estates and creditors that the Debtors be authorized to continue their historic practice of paying amounts due under the PFA as they come due.

59.     Accordingly, for the reasons set forth herein and in the Insurance Motion, the Debtors respectfully request that the relief requested in the Insurance Motion be approved.

E.      *Wages Motion*

60.     Pursuant to this motion (the "Wages Motion"), the Debtors request entry of an order (i) authorizing, but not directing, the Debtors, in accordance with their stated policies and in their discretion, to, among other things and subject to the statutory cap on priority claims, (a) pay prepetition employee wages, salaries and other accrued compensation, (b) pay accrued prepetition obligations to independent contractors and supplemental workers employed by the Debtors, (c) to honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' employee benefits programs, plans, and policies, (d) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business, (e) to pay all related prepetition payroll taxes and other deductions, (f) honor the Debtors' workers' compensation policies, and (g) to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

61.     As of the Petition Date, the Debtors employ approximately 790 Full-Time Employees and 1,196 Part-Time Employees.  The Debtors also employ approximately 19 Independent Contractors and 5 Supplemental Workers whose services are procured indirectly through the Staffing Agencies.  Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees and on account of the Supplemental Workforce may nevertheless be due and owing.

62.     Many of the Debtors' Employees rely on their compensation, benefits, and

24

reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors and the success of sale processes described herein.

63.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption to maximize the value of their assets. Accordingly, the Debtors respectfully request that the relief set forth in the Wages Motion be approved.

F.     *Taxes Motion*

64.     By this motion (the "Taxes Motion"), the Debtors request entry of an order (i) authorizing, but not directing, the Debtors, in their discretion, to remit certain taxes including sales, use, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (collectively, the "Taxes and Fees") that the Debtors incurred prepetition that are or will become due and payable to various federal, state and local taxing authorities and other governmental authorities (each, an "Authority," and collectively, the "Authorities") in connection with the sale of their merchandise at store locations, or through shipments of apparel purchased through the Debtors' website to customers, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

65.     The Taxes and Fees are paid monthly, quarterly, or annually to the respective Authorities, depending on the given Tax or Fee and the relevant Authority to which it is paid. As of the Petition Date, the Debtors estimate that they owe approximately $2,002,000 in

unremitted Taxes and Fees, which are comprised entirely of current tax obligations, are not in respect of "catch-up" payments, $980,000 of which will come due within 21 days of the Petition Date.

66.    Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' ability to maximize proceeds generated by the Store Closing Sales and the Going Concern Sale Process, respectively.  Moreover, some Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from these Chapter 11 Cases and result in unnecessary expenses.  Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' managers and officers, or pursue other remedies that will materially and immediately harm the estates.

67.    I believe that the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on the Debtors' ability to maximize the value of their assets for the benefit of all stakeholders.  Additionally, any attempt to collect the Taxes and Fees from the Debtors' members and officers has the potential to divert the attention of those individuals away from the Debtors' efforts to maximize the value of their assets through the Store Closing Sales and Going Concern Sale Process.

68.    Accordingly, for the reasons set forth herein and in the Taxes Motion, The Debtors respectfully request that the Taxes Motion be approved.

G.    *Shippers and Warehousemen Motion*

69.    By this motion (the "Shippers Motion"), the Debtors request entry of an order authorizing, but not directing, the Debtors to pay, in the ordinary course of business, claims

held by certain of the debtors' shippers, freight forwarders and warehousemen in possession of the Debtors' inventory as of the Petition Date.  The success of the Store Closing Sales depends on the Debtors' ability to stock the Debtors' stores and ship goods to and from the Texas Distribution Center.  To ensure the steady movement of merchandise, the Debtors rely on a network of shippers and freight forwarders that process, ship and replenish the Debtors' inventory.  If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation of the Debtors' merchandise, various statutes, tariffs and agreements permit the shipper, freight forwarders and warehousemen to assert possessory liens against the merchandise in their possession.  Moreover, the Transporters play a pivotal role with respect to the Debtors' ecommerce business, and any failure (or delay) in fulfilling online orders will diminish brand value and customer loyalty, thereby undermining the success of the Going Concern Sale Process.

70.    As of the Petition Date, the Debtors estimate that approximately $1.87 million is owed on account of claims for which amounts will come due on or before twenty-one days from the date hereof for shipping, freight forwarding, and customs duties (the "Transporter Claims").  Payment of the foregoing Transporter Claims will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Debtors' merchandise, and enable the Debtors to realize maximum value through the Store Closing Sales and the Going Concern Sale Process.  I further believe that immediate authorization to satisfy the Transporter Claims will avoid the immediate and irreparable harm that would be thrust upon the estates if such claims were not paid because it will ensure that the Transporters will continue to provide vital services during this critical juncture of the Debtors' sale process.

71.    Because payment of the prepetition Transporter Claims is imperative to the Debtors' ability to maximize the value of their estates for the benefit of their creditors, the

Debtors respectfully request that the relief requested in the Shippers Motion be approved.

H.    *Customer Programs Motion*

72.    In the ordinary course of business, the Debtors provide customers with certain customer-related programs as described in the Customer Programs Motion (such programs, the "Customer Programs") that engender goodwill, maintain loyalty, increase the Debtors' sales opportunities, and allow the Debtors a comparative advantage over their competition. Specifically, through the Customer Programs, the Debtors offer gift cards, refunds and exchanges, coupons and other promotional offers to their customers, issue and accept a private-label credit card, and process customer purchases through the use of (a) credit cards; (b) PayPal; (c) Afterpay; (d) debit cards; and (e) personal checks.

73.    The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business, on the terms forth in the Customer Programs Motion,[8] is necessary to (i) retain their reputation for reliability, (ii) meet competitive market pressures, (iii) maintain positive customer relationships and (iv) ensure customer satisfaction, preserving brand value during the Chapter 11 Cases and thereby enhancing the Debtors ability to maximize value through the sale initiatives described above. Accordingly, for the reasons set forth herein and in the Customer Programs Motion, the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

---

[8]    As further detailed below, and in accordance with the Agency Agreement, the Debtors will accept gift cards issued prepetition at the Debtors' retail stores for the first ten days of the Store Closing Sales. Gift cards will continue to be accepted online while the Going Concern Assets are marketed, pending further notice on the terms proposed in the Agency Agreement Assumption Motion.

01:24702593.10

*I.        Critical Vendor Motion*

74.    By this motion (the "<u>Critical Vendor Motion</u>"), the Debtors request entry of interim and final orders, authorizing the Debtors to pay, in their discretion, the Critical Vendor Claims in an amount up to $500,000 (the "<u>Critical Vendor Claims Cap</u>").

75.    In the ordinary course of business, the Debtors engage a limited number of providers (collectively, the "<u>Critical Vendors</u>") for certain services that the Debtors depend upon to drive revenue.  Any interruption in these services—however brief—risks materially disrupting the Debtors' operations and could cause irreparable harm to their business, goodwill, and customer base, and will likely hinder the Debtors' ability to realize maximum proceeds from the Store Closing Sales and Going Concern Sale Process, respectively.

76.    The Debtors have conducted an extensive analysis and review of the Debtors' immediate operational needs in the context of their wind down and sale efforts, and have concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtors unless their Critical Vendor Claims are paid.  Should any Critical Vendor stop supplying services to the Debtors, the Debtors' sale efforts would be adversely affected as a result for the reasons outlined herein.  The Debtors and their advisors closely analyzed the Debtors' needs during the projected sale timelines, and determined the Critical Vendors Claim Cap with those needs in mind.  As such, the Debtors submit that the amount of the Critical Vendor Claims Cap pales in comparison to the likely damage to the Debtors' businesses and estates should the relief requested herein not be granted.

77.    For these reasons and those set forth in the Critical Vendor Motion, the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates and creditors and necessary to avoid immediate and irreparable harm to the Debtors.

01:24702593.10

*J.      Agency Agreement Assumption Motion*

78.     By this motion (the "Agency Agreement Assumption Motion"), the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to assume the Agency Agreement entered into by and between the Debtors and the Agent; (ii) authorizing the Debtors to immediately continue the Store Closing Sales at the Remaining Closing Stores in accordance with the terms of the Agency Agreement and the Sale Guidelines, with such sales to be free and clear of all liens, claims, and encumbrances; (iii) authorizing, but not directing, the payment of customary retention bonuses to Retained Employees; (iv) authorizing the payment of a pre-petition break-up fee and expense reimbursement to the Stalking Horse; and (v) granting certain related relief.

79.     As set forth above, the Debtors decided that proceeding with the Store Closing Sales at the Remaining Closing Stores that are the subject of the Agency Agreement Assumption Motion and selling the Store Closing Assets pursuant to the terms of the Agency Agreement was in the best interests of their stakeholders.  The terms of the Agency Agreement provide for a guaranteed return (with an increased potential shared recover) to the estates.  This minimizes the Debtors' risks while at the same time motives the Agent to maximize proceeds for the Store Closing Sales.  As referenced above, the Agency Agreement also provides for the disposition of the Debtors' e-commerce inventory in the event that the Debtors do not obtain a letter of intent for the Going Concern Assets by September 14, 2019, or, in the event such a letter is obtained, the Debtors do not also secure a binding stalking horse bid for the Going Concern Assets by September 24, 2019.  Upon further discussions with BRG, Malfitano and the Debtors' other outside advisors, I believe that the terms of the Agency Agreement are market-based and consistent with similar agreements that have been approved by courts.  I am not aware of any facts to suggest that there was fraud or collusion in connection with the bidding process used to

select the Agent and understand that the Agent is not an insider as defined by section 101 of the Bankruptcy Code.

80.     I believe that the Debtors' decision to conduct Store Closing Sales represents the best path for maximizing recoveries to the Debtors' estates and, to that end, I believe that engaging the Agent pursuant to the Agency Agreement will (a) ensure that the Store Closing Sales have optimal success and (b) minimize the administrative expenses to be borne by the Debtors' estates by, among other things, positioning the Debtors to exit all of their retail locations by the end of September 2019.  In particular, the Agent's extensive expertise in conducting liquidation sales generally will allow it to oversee and implement the Store Closing Sales, with the assistance of the Debtors' management and other outside advisors, in the most efficient and cost effective manner.  Accordingly, I believe that entry into the Agency Agreement, which will enable the Debtors to utilize the experience, skills, and resources of the Agent, together with the uninterrupted continuation of the Store Closing Sales, will generate maximum return for the estates and all interested parties.  By contrast, I believe that delaying the Store Closing Sales would increase administrative costs incurred by the Debtors and have a dramatic impact on the recovery realized with respect to the Store Closing Assets, particularly given that the Debtors do not intend to ship any additional inventory to the Remaining Closing Stores.

81.     As discussed above, the Debtors conducted a good-faith and arm's-length prepetition bidding process and auction before selecting the Agent to conduct the Store Closing Sales.   In connection therewith, the Debtors negotiated the terms of the Stalking Horse Agreement, which provided that, in the event the Debtors elect as a consequence of the auction to pursue an alternative higher/better transaction, the Debtors shall pay the Stalking Horse an amount equal to the sum of (i) $100,000 (the "Break-Up Fee") and (ii) an expense reimbursement

of up to $20,000 to cover the Stalking Horse's reasonable out-of-pocket costs and expenses, which includes due diligence and professionals' fees and expenses (the "Expense Reimbursement," and together with the Break-Up Fee, the "Stalking Horse Protections"). The Stalking Horse Agreement was in excess of $1,100,000 higher than initial bids received from the various liquidation firms, and more importantly, provided the E-Commerce Option, which would allow the Debtors the time to conduct the Going Concern Sale Process.

82.    The Debtors submit that the Stalking Horse Protections are appropriate under the circumstances of these case in light of the efforts and expenses that the Stalking Horse undertook in connection with its due diligence review, negotiating the terms of the Stalking Horse Agreement (which served as the basis against which other competing bids were submitted and compared), and preparing for the commencement of the Store Closing Sales. The Stalking Horse Agreement resulted in the Debtors' entry into the Agency Agreement, which provides $500,000 in additional consideration than the Stalking Horse Agreement and an additional two weeks for the E-Commerce Option to be exercised.

83.    Through the Agency Agreement Assumption Motion, the Debtors also seek authority, but not direction, to pay Store Closing Bonuses to store-level, non-insider employees who remain in the employ of the Debtors during the Store Closing Sales. The use and cooperation of the Debtors' employees during the Store Closing Sales is imperative to achieving a successful result. I believe that the Store Closing Bonuses will motive employees during the Store Closing Sales and will enable the Debtors to retain those employees necessary to complete the Store Closing Sales successfully. The amount of the Store Closing Bonuses will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the closing store in which the relevant employees work. The total aggregate cost

of the Store Closing Bonus program will not exceed 10% of the base payroll for all Retained Employees, including payroll taxes, and, importantly, the Store Closing Bonuses are Expenses for which the Agent is unconditionally responsible.

84.     Because the relief sought in the Agency Agreement Assumption Motion is imperative to the Debtors' ability to maximize the value of their estates for the benefit of their creditors through the Store Closing Sales, and for the other reasons set forth above and in the Agency Agreement Assumption Motion, the Debtors respectfully request that the Agency Agreement Assumption Motion be approved.

K.     *DIP/Cash Collateral Motion*

85.     In the DIP/Cash Collateral Motion, the Debtors seek:  (a) approval, on an interim basis, of the DIP Facility in the form of a $12 million senior-secured revolving loan credit facility, (b) authorization to grant liens and superpriority administrative expense claims to the DIP Agent and DIP Lenders, (c) authorization to use cash collateral, including as a "creeping roll-up" of outstanding amounts owed to PNC under the Debtors' prepetition revolving credit facility, and (d) to provide adequate protection to the  Pre-Petition Secured Parties.

86.     The DIP Facility gives the Debtors appropriate flexibility during these Chapter 11 Cases.  The Debtors need the cash available under the DIP Facility to fund ongoing operating expenses while the Debtors conduct the Store Closing Sales and implement the Going Concern Sale Process.   Without the DIP Facility, the Debtors would be unable to pay for necessary operating expenses or business functions critical to the success of their sale efforts, particularly, since PNC was unwilling to consent to the use of cash collateral outside of the protection afforded under the DIP Facility and Interim Order (as defined in the DIP/Cash Collateral Motion).  The Debtors' ability to operate during the Store Closing Sales and while the Going Concern Sale Process unfolds depends on obtaining the interim and final relief requested in

33

the DIP/Cash Collateral Motion.

87.     Based on the Debtors' operational performance and after considering the limited alternatives available, the Debtors do not believe that they would be able to obtain DIP financing from sources other than the DIP Lenders on terms as or more favorable as those under the DIP Facility.  The Debtors' balance sheet is over-leveraged, making it unlikely that third parties other than the DIP Lenders would provide further debt to the Debtors.  Further, substantially all of the Debtors' assets are currently encumbered by the Pre-Petition Obligations and the Pre-Petition Subordinated Obligations.  Because there is little, if any, chance of obtaining better third-party financing, the Debtors believe that further searching is not a viable course of action or prudent expenditure of time and resources.

88.     The DIP Lenders have indicated that the DIP Facility (and the credit agreement and ancillary documents governing the facility) set forth the only terms under which they would agree to provide the Debtors with financing.

89.     The Debtors negotiated the terms of the DIP Facility at arms' length and in good faith, with all relevant parties represented by counsel.  I believe that the negotiated terms are the best available under the circumstances.

## VI.    Conclusion

90.     In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Chapter 11 Cases, the Debtors respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 16, 2019

*/s/  David Rhoads*
David Rhoads
President & Chief Financial Officer
Avenue Stores, LLC

# <u>EXHIBIT A</u>

**Corporate Organization Chart**

01:24702593.10

