**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------X

In re:                                                                    Chapter 11

AVENUE STORES, LLC, *et al.*,[1]                       Case No. 19-11842 (LSS)
                                                                              Jointly Administered

                                              Debtors.         Hearing Date: September 13, 2019 at 10:00 a.m. (ET)
                                                                              Obj. Deadline (Extended for the Committee):
                                                                              September 11, 2019 at 11:00 a.m. (ET)

-------------------------------------------------------------X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL; (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (IV) GRANTING
ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS; (V) MODIFYING
THE AUTOMATIC STAY; (VI) SCHEDULING A FINAL HEARING;
AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Avenue Stores,

LLC, and its affiliated debtors and debtors-in-possession (the "Debtors"), by and through its

undersigned proposed counsel, hereby submits this objection (the "Objection") to the Debtors'

motion (the "Motion")[2] [D.I. 13] for a Final Order, *inter alia*, (i) authorizing the Debtors to (a)

obtain post-petition financing (the "DIP Facility"); (b) grant liens and superpriority

administrative expense claims to the DIP Agent and DIP Lenders; and (c) use cash collateral; (ii)

providing adequate protection to the lenders under the Pre-Petition ABL Facility (the "Pre-

Petition ABL Lenders") and the Pre-Petition Subordinated Lender (collectively, the "Pre-Petition

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Avenue Stores, LLC (0838); Ornatus URG Holdings, LLC (1146); Ornatus URG Real Estate, LLC (9565); and Ornatus URG Gift Cards, LLC (9203).  The Debtors' headquarters are located at 365 West Passaic Street, Suite 230, Rochelle Park, New Jersey 07662.

[2] Capitalized terms not expressly defined herein shall be given the meanings ascribed to them in the Motion.

Secured Lenders"); (iii) modifying the automatic stay; (iv) scheduling a final hearing; and (v) granting related relief.  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

The proposed financing to be provided by the DIP Lenders through the DIP Facility is little more than a mechanism to effect the rapid liquidation of the Pre-Petition Secured Lenders' collateral, including the E-Commerce Business Assets, without regard to the consequences to be suffered by the administrative, priority, and general unsecured creditors of the Debtors' estates. The proposed final order imposes onerous terms that are not designed to maximize the value of the Debtors' assets for the benefit of all stakeholders, but rather to advance the interests of the Pre-Petition Secured Lenders. In so doing, the terms of the proposed order enhance the return on the claims asserted by the Pre-Petition Secured Lenders, while providing the Pre-Petition Subordinated Lender with a premature release.

No such enhancements should be provided to the Pre-Petition Secured Lenders. Moreover, and no such release should be granted to the Pre-Petition Subordinated Lender prior to completion of the Committee's full investigation of, among other things, the validity of the claims and liens asserted by that party and potential causes of action against it on account of prepetition conduct. As discussed below, the Pre-Petition Subordinated Lender is an affiliate of Versa Capital Management, LLC, which holds over 99% of the equity in the Debtors and appears to be the recipient of significant monetary disbursements from the Debtors beginning in 2012. Until such time as the Committee has a fair opportunity to fulfill its duty of investigation into transactions involving the Pre-Petition Subordinated Lender, the Pre-Petition Lender should not be entitled to a release or other limitation of liability to the Debtors' estates or creditors thereof.

While the DIP Facility provides the Debtors with sufficient liquidity to conduct store-closing sales at their remaining 190 brick-and-mortar locations,[3] the DIP Facility permits the Pre-Petition ABL Lenders to elevate approximately $15.3 million of pre-petition debt into superpriority, secured administrative claims.  In addition, the severely expedited timeline for the sale of the Debtors' E-Commerce Business Assets, as dictated by the Pre-Petition ABL Lenders, leaves little opportunity for the Debtors to market these assets on a level playing field and provide sufficient time to potential purchasers to complete the necessary due diligence and timely submit the required bid documents.[4]  Rather, the Pre-Petition ABL Lenders, in their capacity as DIP Lenders, are forcing the Debtors to consummate a sale of the Debtors' valuable intellectual property and e-commerce platform while simultaneously conducting an expedited process by which to liquidate their stores.[5]  This already overburdened sales process is further complicated by the late retention of the Debtors' proposed investment banker, Configure Partners, LLC, which underscores that any pre-petition marketing efforts on behalf of the Debtors were cursory and short-lived.[6]  To achieve the desired goal of maximizing the value of the E-Commerce Business Assets while acknowledging extant budgeting constraints, the sales timeline should be extended as provided herein.

---

[3] The Committee will be evaluating management's decision to proceed with this full chain liquidation prior to the Debtors' bankruptcy filing seemingly without the benefit of any attempt at a full chain going-concern marketing process.

[4] As set forth in the Committee's objection ("Bid Procedures Objection") to the Debtors' Bid Procedures Motion (the "Bid Procedures Motion") [D.I. 53], the Bid Procedures suffer from a number of other defects, most glaringly the inappropriate advantages bestowed on the Pre-Petition Subordinated Lender.

[5] All this in exchange for funding a process that will inure to the benefit of the Pre-Petition Secured Lenders, including the DIP Lenders, while leaving little, if any, remaining value for other creditors. The Debtors do not recite an exit plan in their pleadings.

[6] Configure Partners, LLC was retained by the Debtors on August 1, 2019.

In addition to overreaching for benefits beyond what they could obtain in a state court foreclosure action, the DIP Lenders have demanded the following:

- A roll-up of pre-petition indebtedness into postpetition indebtedness that is secured by new liens on valuable, previously unencumbered assets, including the proceeds of leases, avoidance actions, and commercial tort claims;

- Releases for the Pre-Petition Subordinated Lender and its directors and officers, an affiliate of the Debtors' Sponsor; and

- Numerous other protections, including excessive adequate protection, a waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code, and marshaling rights.

Of particular concern are the releases proposed to be granted to the Pre-Petition Subordinated Lender and its directors, officers and insiders. As the Pre-Petition Subordinated Lender is an affiliate of Versa Capital Management, LLC, which holds over 99% of the equity in the Debtors, the circumstances and facts surrounding the issuance of the Pre-Petition Subordinated Note warrant a high degree of scrutiny, as do various prepetition transactions involving the Debtors, the Pre-Petition Subordinated Lender, and the Sponsor.

For example, the Committee is aware of at least one large dividend paid to Versa Capital Management, LLC or its affiliates since it acquired the Debtors in 2012.[7] The Committee further believes that Versa benefitted from receipt of significant management fees in the interceding years. As such, any releases granted to the Pre-Petition Subordinated Lender should only be allowed in the context of a confirmed plan, following the Committee's full investigation into validity of the claims and liens asserted in connection with the Pre-Petition Subordinated Note and financial transactions involving Versa Capital Management, LLC and its affiliated entities. The Committee's ability to conduct such an investigation in discharge of its fiduciary duties

---

[7] Upon information and belief, this dividend paid to equity holders was made possible by a $90 million term loan taken at a time when the Debtors were debt-free.

should not be forcibly constrained by the Committee Investigation Budget of $25,000, which does not extend to prosecution or challenge of the validity, enforceability, perfection, priority or extent of the liens asserted by the Pre-Petition Secured Lenders. As detailed below, this restriction, together with the limited budget allotted for the fees of the Committee professionals, impairs the rights and powers that the Bankruptcy Code confers on the Committee and undermines the integrity of the bankruptcy process.

Through its proposed counsel, the Committee has made its best efforts to negotiate appropriate modifications to the proposed DIP Facility and Budget with the Debtors and Pre-Petition Secured Lenders. However, to date, the Committee's good faith negotiations have not resulted in a resolution or meaningful progress on the points that are key to the Committee's constituents, including (i) releases to the Pre-Petition Subordinated Lender; (ii) Committee's standing to commence litigation (if warranted); (iii) payment of all necessary administrative claims; (iv) no liens on or superpriority claims to proceeds of previously unencumbered assets, including proceeds of avoidance actions, commercial tort claims and leasehold interests; (v) extension of the Milestones on the E-Commerce Business Assets sale process; and (vi) the modifications to the Budget, including fees for the Committee's investigation of pre-petition liens and claims, as well as fees to the Committee's professionals to effectively exercise the Committee's fiduciary duties. The Committee is, therefore, compelled to object to the Motion.

# BACKGROUND

## A.    The Cases

1.      On August 16, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and their properties as debtors-in-possession.  No trustee or examiner has been appointed in these cases.

2.      On August 27, 2019, the Committee was appointed in these cases by the Office of the US Trustee, consisting of the following three members: (i) Jiangsu Guotai Litian Enterprises; (ii) Land 'N Sea, Inc.; and (iii) Valentine USA, Inc.[8]  That same day, the Committee met and decided that it wished to employ the firms of Cooley LLP and Potter Anderson & Corroon LLP as its counsel to advise and represent it in this proceeding *nunc pro tunc* to August 27, 2019. The Committee further selected CBIZ, LLC to serve as its financial advisor.

## B.    The Pre-Petition ABL Facility

3.      Prior to the Petition Date, the Debtors were borrowers and guarantors under the certain credit agreement dated as of April 12, 2019 (as amended from time to time, the "Pre-Petition ABL Agreement").  The Pre-Petition ABL Facility retired an existing term loan and permitted borrowings of up to $45 million, including a first-in, last-out loan tranche (the "FILO Loan") of $6 million.  Availability under the Pre-Petition ABL Facility is subject to a borrowing base, which is calculated monthly based on percentages of the value of certain of the Debtors' inventory and receivables and is subject to certain reserves and sub-limits.

4.      The Pre-Petition ABL Facility matures on April 12, 2024.  As of the Petition Date, the aggregate amount outstanding under the Pre-Petition ABL Facility was approximately

---

[8] On September 5, 2019, the Committee voted to elect Byer California Inc. as a non-voting Committee member.

$15.3 million (the "Pre-Petition ABL Obligations").    The Pre-Petition ABL Facility is guaranteed by Ornatus RE and secured by a first-priority lien on substantially all of the Debtors' assets.[9]  Amounts due under the FILO Loan are also guaranteed by affiliates of Versa Capital Management, LLC ("Versa" or the "Sponsor"), which holds over 99% of the Debtors' equity.

## C.    The Pre-Petition Subordinated Note

5.        On or about April 12, 2019, Debtor Ornatus Holdings issued that certain Master Subordinated Note (as amended from time to time, the "Pre-Petition Subordinated Note") in favor of Ornatus URG Funding, LLC (the "Pre-Petition Subordinated Lender"), an affiliate of the Sponsor, which secures a loan in the principal amount of approximately $38.4 million plus additional amounts advanced by the Sponsor and certain of its affiliates.  The Pre-Petition Subordinated Note is guaranteed by the Debtors and is collateralized by a security interest in substantially all of the Debtors' assets which, under the terms of the Pre-Petition Subordinated Note, is subordinate to the obligations under the Pre-Petition ABL Facility.

6.        The Pre-Petition Subordinated Note bears interest at a rate of 15% per annum, which is paid in kind.  As of the Petition Date, the Pre-Petition Subordinated Lender asserts that no less than $38.9 million was due under the Pre-Petition Subordinated Note.

## D.    The Liquidity Support Agreement

7.        As contemplated by that certain Liquidity Support Agreement dated April 12, 2019, by and among the Debtors and the Pre-Petition Subordinated Lender (the "Liquidity Support Agreement"), the terms of the Pre-Petition Subordinated Note allow the Sponsor,

---

[9] Under the Pre-Petition ABL Facility, the Pre-Petition Subordinated Lenders have a first lien on certain of the Debtors' assets, including, among others: i) the rights or interests in any contract, lease, permit, license, charter, or license agreement; ii) the equity interests of any of the subsidiary in excess of 65% of all issued and outstanding share entitled to vote; and iii) a vacant lot located in Troy, Ohio, owned, as of the closing date of the Pre-Petition ABL Facility, by Debtor Ornatus RE.

through the Pre-Petition Subordinated Lender, to cause additional funds to be advanced from time to time to support the Debtors' business operations.

8.      As set forth in the First Day Declaration, from October 2018 through April 2019, the Sponsor and the Pre-Petition Subordinated Lender provided capital infusions to the Debtors of approximately $25.2 million, consisting of i) approximately $14.2 million funded directly to the Debtors; ii) $11 million in letters of credit provided for the Debtors' benefit, and iii) the deferment or funding of certain expenses on behalf of the Debtors in the aggregate amount of approximately $2.1 million.

**E.      The Proposed DIP Facility**

9.      On the Petition Date, the Debtors filed the Motion.  Pursuant to the Motion, the Debtors seek access to the $12 million DIP Facility to be provided by the Pre-Petition ABL Lenders.  In connection with the DIP Facility, the DIP Lenders seek to be paid fees, including a i) $250,000 closing fee; ii) a Facility Fee of 0.0.375% of undrawn commitments; iii) a fronting Fee of 0.25% of the outstanding l/c amount; iv) a Collateral Evaluation Fee of $1,250 per day for evaluation (plus a field exam management fee of $2,500 for new facilities and $1,500 for recurring examinations); and v) a monthly Collateral Management Fee of $2,500.

10.      The use of proceeds from the DIP Facility is limited in accordance with the Budget, subject only to a ten percent (10%) variance on an aggregate basis, which variance may, in the DIP Agent's sole discretion, be increased up to fifteen percent (15%).

11.      In return for providing the DIP Facility, the DIP Lenders seek a priming lien and superpriority claim on the DIP Collateral made up of essentially all assets of the Debtors, including liens on previously unencumbered avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), commercial tort claims, and all of the Debtors' leasehold interests.

12.     The DIP Agreement also requires that the Debtors adhere to certain milestones (the "Milestones"), including:

| Milestone Description | DIP Agreement Milestone |
| --- | --- |
| Entry of Bid Procedures Order | September 13, 2019 |
| Receipt of letter of intent for E-Commerce Business | September 14, 2019 |
| Executed APA for E-Commerce Business and deposit received | September 24, 2019 |
| Auction | October 3, 2019 |
| Entry of Sale Order | October 7, 2019 |
| Sale Consummation | October 14, 2019 |

13.     Subject to entry of a final order, the DIP Facility provides that not only the DIP Lenders but all of the Pre-Petition Secured Lenders will be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code and that the Pre-Petition Secured Lenders will further be entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code.  In connection with the DIP Facility, the Debtors have agreed that neither the DIP Lenders or Pre-Petition ABL Lenders shall be subject to the equitable doctrine of marshalling with respect to the Pre-Petition Collateral or DIP Collateral.

14.     The DIP Facility provides the Pre-Petition Secured Lenders with Adequate Protection Liens, fees and out-of-pocket expenses, including legal and other professionals' fees and expenses, whether arising before or after the Petition Date.  As further adequate protection, under the DIP Financing Documents, the Pre-Petition Secured Lenders shall be entitled to interest on account of the outstanding Pre-Petition ABL Obligations (at the default rate) and

interest on the the Pre-Petition Subordinated Obligations (and together with the Pre-Petition ABL Obligations, the "Pre-Petition Obligations").

15.     The Debtors have stipulated to the validity of the aggregate amount of the Pre-Petition Obligations, and the enforceability and priority of the liens and security interests securing those obligations.  The Interim Order provides the Committee with a 60-day period (the "Challenge Period"), and a budget of $25,000, to independently investigate (but not prosecute), claims against and possible objections with respect to the Pre-Petition Obligations, and the pre-petition liens and security interests asserted by the Pre-Petition Secured Lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Secured Lenders).  Pursuant to the proposed order, if no Challenge is commenced as of the end of the Challenge Period period, the Interim Order provides that the Debtors' stipulations with rect to the Pre-Petition Obligations will become binding on all parties in interest.

16.     As proposed, the post-default Carve-Out Amount would be a mere $50,000, which would be solely available for the payment of allowed fees and expenses incurred by Professionals retained by the Debtors, not the Committee.  Furthermore, the DIP Facilty, as drafted, would not allow for the payment of any fees incurred by the Committee's Professionals in attempting to challenge the DIP Lenders' assertion that an Event of Default has occurred.

17.     As yet unfiled details of the proposed Budget reflect, only an infinitesimal portion of the over $2.9 million allocated towards Professional Fees has been alotted to cover the fees and expenses of the Committee's professionals.

18.     The Budget also includes entries indicating that the Debtors anticipate paying approximately $1.2 million towards stub rent at some undetermined point during the winding

down of these cases. The Budget reflects the Debtors' assertion that no amounts are owed to vendors for goods received within twenty (20) days prior to the Petition Date ("503(b)(9) Claims").

19.     Of critical importance, the Budget ignores the fact that the DIP Facility will terminate upon the closing of a sale, at which point the Debtors will not have authority to use cash collateral, rendering any post-sale entries on the Budget meaningless.

20.     On August 21, 2019, the Court entered the Interim Order and scheduled a hearing to consider the DIP Motion on a final basis for September 13, 2019.

## OBJECTION

**A.     Releases for the Pre-Petition Subordinated Lender Should Not be Granted, and Limitations on the Committee's Ability to Investigate and Pursue Claims Should Not be Imposed.**

21.     The Interim Order provides that the Pre-Petition Subordinated Lender and its directors and officers would be released from any and all claims and causes of actions (including recharacterization and equitable subordination) related to the Pre-Petition Subordinated Lender's pre-petition liens, claims and conduct.  Releases contained in postpetition financing orders are typically more narrowly tailored to release only postpetition lenders from claims concerning the postpetition financing.  Here, the Pre-Petition Subordinated Lender is not a postpetition lender and has done nothing more than consent to the Debtors' use of its purported cash collateral and priming of its liens by the DIP Lender and increasing the amount of the Sponsor Guaranty by $730,000.

22.     Accordingly, any releases for the Pre-Petition Subordinated Lender should be considered only in the context of the any proposed chapter 11 plan. The Pre-Petition Subordinated Lender should not be allowed to opportunistically advantage itself through the DIP Facility by obtaining a broad release for its prepetition conduct. To the extent that any release is

given to the Pre-Petition Subordinated Lender, it should only be considered on the basis of a fully developed factual picture following the Committee's investigation of what that conduct entailed, what transactions were implicated, and how the Pre-Petition Subordinated Lenders' behavior has affected the Debtors' estates.

23.     To that end, the Committee's investigation rights should be expanded.  The terms of the Interim Order limit the time during which the Committee may investigate and initiate an adversary proceeding asserting claims against the Pre-Petition Secured Lenders to only 60 days after the appointment of the Committee.  Whereas a 60-day deadline may be reasonable as it relates to the extent and validity of the liens of the Pre-Petition ABL Lenders, such a temporal constraint is unreasonable to the extent it provides the Pre-Petition Subordinated Lender with the sweeping release it demands. The Final Order should be clear that it does not modify, limit, or impair in any way the Committee's ability to investigate the validity of the Pre-Petition Subordinated Obligations and the liens asserted by the Pre-Petition Subordinated Lender, and that the Challenge Deadline does not apply with respect to that purported indebtedness or any claims to be asserted for the benefit of the unsecureds against the Pre-Petition Subordinated Lender.

**B.      Adequate Protection Liens Should Only Attach Upon a Showing of Diminution in Value.**

24.     In connection with the DIP Facility, the Pre-Petition Secured Lenders demand automatically valid and perfected additional and replacement liens on all of the Debtors' assets irrespective of whether the Pre-Petition Secured Lenders even held liens on such assets pre-petition or whether the liens were valid and properly perfected.

25.     With respect to adequate protection liens, it is not clear why such liens are being granted to the Pre-Petition ABL Lenders in the the first place.  For example, given the

protections afforded by the roll-up, there cannot be any diminution in the Pre-Petition ABL Lenders' collateral.    The Pre-Petition Subordinated Lender is not providing any new financing to the Debtors. To the extent the Court determines that the Pre-Petition Secured Lenders are entitled to adequate protection liens, those liens should only attach to the extent the Pre-Petition Secured Lenders establish, through a motion on notice and admissible evidence, diminution in the value of their pre-petition collateral.

26.    The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay"); *In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence *vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection").

27.    Courts have widely held that a creditor cannot assert that every dollar spent in a chapter 11 case results in a dollar of diminution to the lender.  *See, e.g., Official Comm. of Unsecured Creditors v. UMB Bank, N.A.  (In re Residential Capital, LLC)*, 497 B.R. 403, 422 (Bankr. S.D.N.Y. 2013); *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982); *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 826 (Bankr. S.D.N.Y. 1982).  Instead, the creditor is required by statute to show that the value of its cash and non-cash collateral, when considered in the aggregate, has diminished as a result of the bankruptcy case. *See* 11 U.S.C. § 363(p)(2) (providing that any entity asserting an interest under section 363 "has the burden of proof on the issue of the validity, priority, or extent of such interest").

28.     Here, the Pre-Petition Secured Lenders have not offered proof of any actual or threatened diminution in the value of their collateral during this expedited liquidation process. Because the Pre-Petition Secured Lenders have not established even a *prima facie* case for adequate protection correspoding to any asserted diminution, this Court should deny the requested adequate protection.  *See In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) (secured creditor "must, therefore, prove this decline in value – or the threat of a decline – in order to establish a prima facie case."); *In re Blehm Land & Castle Co.,* 859 F.2d 137 (10th Cir. 1988) ("adequate protection provided must not substantially exceed that to which the secured creditor is entitled").

**C.      No Liens on or Superpriority Claims to Proceeds of Previously Unencumbered Assets, Including Proceeds of D&O Insurance, Avoidance Actions, Commercial Tort Claims, and Leasehold Interests.**

29.     The DIP Liens also should not reach previously unencumbered assets, including D&O insurance, commericial tort claims, leasehold interests, and Avoidance Actions.  The Pre-Petition Secured Lenders did not lend against these assets at any time prior to the bankruptcy filing, which assets may present a valuable source of recovery for unsecured creditors.  As such, the Pre-Petition Secured Lenders should not be able to grab these additional assets merely for permitting the Debtors to conduct an orderly liquidation of the Pre-Petition Secured Lenders' collateral, a process that will inure to the benefit of the Pre-Petition Secured Lenders, including the DIP Lenders.

30.     Furthermore, avoidance actions are property of the estate created by the debtor's bankruptcy filing, and are therefore typically reserved for unsecured creditors.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been

transferred away."); *In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the debtor but rather are created by operation of bankruptcy law and belong to the debtors' creditors). Indeed, some courts have expressly prohibited granting liens on such actions or their proceeds. *See e.g., Official Comm. of Unsecured Creditors v. Goold Elecs. Corp.*, Case No. 93 C 4196, 1993 WL 408366 at *3-4 (N.D. Ill. Sept. 22, 1993). Exclusion of Avoidance Actions from the DIP Collateral is especially crucial here, where such causes of action may constitute the only source of meaningful recovery available to the Debtors' unsecured creditors.

D.    **Adequate Protection in the Form of Interest Payments is Inappropriate.**

31.    The Interim Order provided the Pre-Petition Secured Lenders with adequate protection in the form of payment of reasonable and documented fees and out-of-pocket expenses, including professional fees. The Committee takes no issue with this inclusion in the Final Order. However, by the proposed Final Order, upon the later of i) payment in full of the Pre-Petition ABL Obligations and DIP Obligations or ii) expiration of the Challenge Period with no Challenge having been asserted, the Pre-Petition Subordinated Lender would receive additional adequate protection through payment of postpetition interest, notwithstanding the fact that this lender is a vastly undersecured creditor to the tune of tens of millions of dollars with little to no reasonable prospect of recovering full payment. Section 506(b) of the Bankruptcy Code limits payment of postpetition interest to oversecured creditors, and then only to the extent of the equity cushion the secured creditor enjoys. Consequently, the proposed Final Order should be modified to remove this proposed windfall for the Pre-Petition Subordinated Lender.

**E.    Milestones Required by the DIP Agreement May Hinder the Debtors' Ability to Maximize the Value of their Estates and Should Be Extended.**

32.    Section X, ¶10.7 of the DIP Agreement filed together with the Motion requires the Debtors to adhere to the Milestones.  The Committee believes that the timelines set forth in this section are extremely expedited and provide insufficient time for the Debtors to market and sell their assets, whereby potentially hindering the Debtors' ability to maximize the value of their estates, and should be extended or waived.  The Debtors' proposed investment banker was only retained on August 1, just prior to the bankruptcy filing, and only started the marking process for the e-commerce platform during the summer vacation period.  Moreover, the circumstances of the sale process are highly unusual, in that going out of business sales are being conducted at all of the Debtors' retail locations, while the Debtors are simultaneously marketing their E-Commerce Business Assets as a going concern. This, without a doubt, requires further scrutiny and diligence by potential bidders.

33.    The extension or waiver of the Milestones would provide the Debtors and all parties-in-interest with sufficient time to achieve a successful sale, which would in turn ensure a timeline that is fair and reasonable to all parties, rather than one designed to favor the Pre-Petition Secured Lenders, which appear to be acting in their own self-interest.  The extension would also alleviate some of the burdens imposed by the simultaneous store liquidation sale.

34.    To provide the Debtors with sufficient time to market and sell their assets to the highest and best bidder, the Milestones must be modified or waived as follows:

| Milestone Description | DIP Agreement Milestone | Proposed Milestone |
|---|---|---|
| Entry of Bid Procedures Order | September 13, 2019 | Extended |
| Receipt of letter of intent for E-Commerce Business | September 14, 2019 | Waived |

| Milestone Description | DIP Agreement Milestone | Proposed Milestone |
|---|---|---|
| Executed APA for E-Commerce Business and deposit received | September 24, 2019 | Extended |
| Auction | October 3, 2019 | Extended to no less than three (3) business days subsequent to the Bid Deadline[10] |
| Entry of Sale Order | October 7, 2019 | Extended by a commensurate timeframe after new Auction Date |
| Sale Consummation | October 14, 2019 | Extended by a commensurate timeframe after new Auction Date |

35.     The proposed (and more realistic) timeline will benefit all parties, allowing the Debtors to explore value-maximizing options while meeting the goals contemplated by the bankruptcy process. *See Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("[t]he paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.").

**F.      The Budget Allocated to the Investigation of Pre-Petition Liens and Claims is Inadequate.**

36.     The DIP Facility caps the amount of funds available to the Committee for the investigation of claims against the Pre-Petition Secured Lenders at $25,000 (the "Committee Investigation Budget").  The Committee may not, however, use any portion of the Committee Investigation Budget to prosecute or challenge the validity, enforceability, perfection, priority or extent of the liens asserted by the Pre-Petition Secured Lenders.

---

[10] While the DIP Agreement does not reflect the Bid Deadline, the Bid Procedures Motion sets this deadline as October 1, 2019.  In the Bid Procedures Objection, the Committee proposes that this deadline be extended to October 14, 2019.

37.     These restrictions improperly seek to shield the Pre-Petition Secured Lenders from potential claims at the unacceptable expense of the Committee's ability to acquit its duty to represent the interests of unsecured creditors and the adversary system envisioned by the Bankruptcy Code.  In chapter 11 cases of this nature, courts in this district routinely approve caps well above $25,000 for funds available to committees for the investigation of claims against pre-petition lenders.  *See, e.g., In re Elk Petroleum, Inc.*, No. 19-11157 (LSS) (Bankr. D. Del. July 25, 2019) [D.I. 313] (approving increased investigation budget of $150,000, up from $20,000); *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. July 18, 2019) [D.I. 477] (approving investigation budget of $150,000); *In re FTD Companies, Inc.*, No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019) [D.I. 311] (approving increased investigation budget of $100,000, up from $25,000); *In re Kona Grill, Inc.*, No. 19-10953 (CSS) (Bankr. D. Del. May 28, 2019) [D.I. 165] (approving investigation budget of $60,000); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 1, 2019) [D.I. 294] (approving investigation budget of $200,000).

38.     The actions of the Committee's professionals should not be dictated by the DIP Lenders but, rather, by the duties imposed upon such professionals by the Bankruptcy Code.  The integrity of the bankruptcy process mandates that the Committee's professionals be permitted to advocate on behalf of unsecured creditors without being subject to the control of third parties whose interests are adverse to those of the Debtors' estates.  Accordingly, the Committee requests that an additional $25,000 be made available to the Committee for the investigation of claims against the Pre-Petition ABL Lenders, and that, for the reasons detailed above, no limit be placed on the budget available to investigate the liens and claims of the Pre-Petition Subordinated Lender.

G.    **The Budget and Carve-Out Must Provide for Adequate Committee Professionals' Fees in Order for the Committee to Effectively Exercise its Fiduciary Duties.**

39.    The terms set forth in the Interim Order and the Budget disadvantage the Committee by providing for wholly disparate treatment of its professionals.  The unfiled detail of the Budget proposed by the Debtors and DIP Lenders allots a minuscule portion of the over $2.9 million allocated towards Professional Fees to cover allowed and unpaid fees and expenses incurred by the Committee's professionals in these chapter 11 cases.  Furthermore, as proposed, the $50,000 allocated towards the post-default Carve-Out Amount would be solely available for the payment of allowed fees and expenses incurred by Professionals retained by the Debtors, not the Committee.

40.    In short, the issue is whether a party may enjoy the benefits of chapter 11 without permitting the adversary system to function.  Under the current scheme proposed by the Budget, the disparity between the Debtors' (and DIP Lender's) professionals and the Committee's professionals harms the balanced scheme developed between adversary parties under the Bankruptcy Code.  The Debtors and DIP Lender should not be permitted to march quickly through this case, preserving and disposing of the DIP Lender's collateral for the sole benefit of the DIP Lenders, while denying the Committee the necessary funds to perform its statutory obligations to the Debtors' estates.  *See* 11 U.S.C. § 1103.  The ability of any committee to have full participation in the chapter 11 process is the best means to maximize recovery to unsecured creditors.

41.    In this District, courts typically deem a committee professionals' fee budget adequate when it is at a fairly significant percentage of a debtors' professionals' fee budget due, in part, to the fact that the debtors' professionals have usually been engaged in the case pre-petition for many months (if not longer) and often have substantial retainers.  *See, e.g., In re*

*Eastern Outfitters, LLC*, Case No. 17-10243 (LSS) (Bankr. D. Del. Mar. 31, 2017) [D.I. 260] (approving final DIP Financing order where the budget reflected committee professional fees being approximately 35% of the Debtors' professional fees); *In re Pacific Sunwear of California, Inc.*, Case No. 16- 10882 (LSS) (Bankr. D. Del. Apr. 7, 2016) (approving fees and expenses of Committee professionals totaling approximately 35% of those incurred by the Debtor's professionals); *In re The Wet Seal, LLC*, Case No. 17-10229 (CSS) (Bankr. D. Del. Feb. 2, 2017) [D.I. 463] (cash collateral budget providing for committee fees and expenses of up to approximately 39% of those incurred by the Debtor's professionals for an eight-month period); *In re Channel Master Holdings, Inc.*, No. 13-13004, 2004 Bankr. LEXIS 576, *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a postpetition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case); *In re Evergreen Solar, Inc*., Case No. 11-12590 (MFW), Hr'g Tr. (D.I. 189) at 42-51 (Bankr. D. Del. Sept. 6, 2011) (declining to apply the debtor's proposed caps and instead, substituted a general pool for all professionals from which debtor and committee professionals could recover fees on a pro rata basis).

42.     Here, the Budget as proposed falls significantly short of even the minimal guideposts established in this district with respect to the amount allocated towards the professional fees and expenses incurred by the Committee.  The Committee's professionals should be provided with appropriate fees under the Budget and the post-default Carve-Out Amount with which to carry out the Committee's fiduciary duties.

43.     Furthermore, the Final Order should make clear that any fees incurred by the Committee's professionals with respect to challenging either i) the validity, priority, perfection, or enforceability of the Pre-Petition Obligations, or ii) any Event of Default asserted by the DIP

Lenders or fees for prosecuting any causes of action brought against the Pre-Petition Subordinated Lender would not be "Excluded Professional Fees" as currently proposed.

## H.    A Section 506(c) Waiver Should Not Be Permitted.

44.    There can be no guarantee of stakeholder recoveries in these cases. Yet, the Debtors have negotiated away their ability to surcharge the Pre-Petition Secured Lenders' collateral under Bankruptcy Code section 506(c) for the costs of administering these cases in connection with the proposed DIP Facility. In light of the issues raised in this Objection, the Debtors' refusal to reserve the right to seek to allocate these costs should not be approved unless the Debtors can guarantee that all administrative expense claims will be paid in full. Furthermore, although the Budget accounts for the payment of stub rent, it must be modified to make clear when stub rent payments will be issued. The Committee should also be given an opportunity to verify that there are no amounts owed towards 503(b)(9) Claims. Without the leverage afforded by the Debtors' rights under section 506(c), there can be no assurance that the resources available to the Debtors will prove sufficient to carry these cases to a successful conclusion in the form of a confirmed plan.

45.    The use of the landlords' stores is necessary to liquidate the lenders' collateral and stub rent qualifies as "reasonably, necessary costs and expenses of preserving, or disposing of," the lenders' collateral. 11 U.S.C. § 506(c). Moreover, the inventory received by the Debtors within 20 days of the Petition Date is the freshest inventory and drives sales of the balance of the Debtors' merchandise by providing value beyond what can be seen on a price tag, preserving the overall value of the Debtors' inventory. Any obligations underlying potential 503(b)(9) Claims are therefore also reasonable and necessary to preserve the Pre-Petition Secured Lenders' collateral.

46.     Courts have widely recognized that Bankruptcy Code section 506(c) waivers are not to be granted lightly.  *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.* 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest, authorizing the surcharge of a secured lender's collateral where reasonable and appropriate).   At its core, section 506(c) "is designed to prevent a windfall to the secured creditor. . . [Section 506(c)] understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . ."  *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (emphasis added).  Indeed, it is wholly inappropriate for the Pre-Petition Secured Lenders to obtain the benefits of chapter 11 while at the same time refusing to accept the costs.  *See  In re Allen Family Food, Inc*., No. 11-11764 (KJC) (Bankr. D. Del. June 28, 2011) [D.I. 89] ("Courts in this jurisdiction have held, a bankruptcy case cannot be run solely for the benefit of a secured creditor—the secured creditor that is availing itself of the protections of the Bankruptcy Code must 'pay the freight'...") (quoting Transcript of Hearing at 100:17-20, *In re NEC Holdings Corp*., No. 10-11890 (PJW) (Bankr. D. Del. July 13, 2010) [D.I. 224] (transcript of hearing before Hon. Christopher S. Sontchi).

47.     Given the facts of this case in which the Debtors seek a waiver of all section 506(c) rights as against all Pre-Petition Secured Lenders, the waiver is neither fair nor equitable and should not be approved until, at a minimum, the Budget is modified to make clear the timing of stub rent payments.

I.      **The Waiver of the "Equities-of-the-Case" Exception Under Section 552(b) is Inappropriate.**

48.     In connenction with entry of the Final Order, the Debtors ask this Court for an advisory ruling that there will never be equities of this case that may justify, after notice and a hearing under section 552(b) of the Bankruptcy Code, a distribution to unsecured creditors from the postpetition efforts of the Debtors' employees and other stakeholders.

49.     There is no legal support for this relief, particularly in the context of a financing and cash collateral order, because the equities-of-the-case exception contained in section 552(b) of the Bankruptcy Code is a statutory grant of power to the Court, not the Debtors.  Unlike section 363 or section 364, there is no phrase "the trustee may" (or may not) in section 552(b). The statute governs the effect of pre-petition liens on postpetition property, and leaves to the Court's retrospective discretion to justify the allocation of postpetition value to secured and unsecured creditors depending on what transpires.

50.     Accordingly, prospective waivers of the equities-of-the-case exception are inappropriate and should not be approved.  *See, e.g., Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying request for 552(b) waiver as premature because factual record was not fully developed); *In re Metaldyne Corp.*, No. 09-13412, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (declining to waive equities of the case exception in connection with approval of debtor's use of cash collateral).

J.      **The Equitable Doctrine of Marshaling Should be Preserved.**

51.     Marshaling requires a "senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit."  *In re Advanced Marketing Servs., Inc.,*

360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007).  Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 236 (1963).  Marshaling can be pursued by Committees and for the benefit of unsecured creditors.  *See e.g., In re America's Hobby Ctr., Inc.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("Because a debtor in possession has all the rights and powers of a trustee . . . [the Committee] standing in the shoes of the debtor in possession . . . can assert this [marshaling] claim.").

52.      Under the DIP Agreement, the Debtors seek to limit the Court's ability to apply marshaling.  The DIP Lenders have liens on a diverse pool of assets, and at this early stage in the case there is no basis to waive this important doctrine.  As set forth above, at minimum, the Court should require the DIP Lenders to satisfy their claims or adequate protection claims, if any, from the proceeds of assets subject to their pre-petition liens before they can look to the proceeds of assets that they did not have liens on pre-petition.

## **RESERVATION OF RIGHTS**

53.      This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including by filing of a declaration in support thereof, to introduce evidence at any hearing relating to this Objection, and to further object to the Motion, on any grounds that may be appropriate.

**WHEREFORE**, the Committee requests that the Court deny the Motion absent the Committee's requested modifications and provide the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated:    September 11, 2019
          Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

/s/ *L. Katherine Good*
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
D. Ryan Slaugh (No. 6325)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801-3700
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
       kgood@potteranderson.com
       rslaugh@potteranderson.com

- and -

**COOLEY LLP**
Jay Indyke
Cullen Speckhart
Summer McKee
Olya Antle
55 Hudson Yards
New York, New York 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: jindyke@cooley.com
       cspeckhart@cooley.com
       smckee@cooley.com
       oantle@cooley.com

*Proposed Co-Counsel for the Official Committee of Unsecured Creditors of Avenue Stores, LLC, et al.*